USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/23/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
YOVANNY DOMINGUEZ, *individually and on behalf of all other persons similarly situated*,

                Plaintiff,

-v -

BANANA REPUBLIC, LLC,

                Defendant.
------------------------------------------------------------X

1:19-cv-10171-GHW

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

      Although the question presented in this case is novel, it is certainly not unique.  Over the past eight months, the Southern and Eastern Districts of New York have been flooded with litigation from a handful of plaintiffs seeking injunctive relief, compensatory damages, and, of course, attorneys' costs and fees for alleged failures by numerous retail and service establishments to sell accessible gift cards.[1]  Much of this litigation is premised on the meritless argument that Title III of the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181, *et seq.*, requires retailers to create specialty goods for the visually impaired.  Because no read of the ADA supports that allegation, Banana Republic, LLC's motion to dismiss is GRANTED.

### I.    BACKGROUND[2]

      The premise of this case is relatively straightforward.  Banana Republic, LLC ("Defendant" or "Banana Republic"), like many other retail businesses, offers consumers the opportunity to purchase "pre-paid cash cards, colloquially referred as 'store gift cards,'" that can be used in place of cash at its stores.  First Amended Complaint ("FAC"), Dkt. No. 22, ¶¶ 4 & n.2, 55.  Though they

---

[1] Plaintiff's counsel, Bradly G. Marks of The Marks Law Firm, and Jeffrey M. Gottlieb of Gottlieb & Associates are responsible for filing many of these cases.  This Court alone has eleven of counsel's cases pending before it.

[2] The facts in the First Amended Complaint are presumed true for the purpose of this motion.

look and feel like credit cards, *see* FAC ¶ 35, they are redeemable only at "a specified merchant or affiliated merchants." FAC ¶ 29 & n.4.

On October 26, 2019, Yovanny Dominguez ("Plaintiff") called Banana Republic's customer service office to ask whether the store sold Braille gift cards. *See* FAC ¶ 16. An employee told him that Banana Republic did not. *See* FAC ¶ 16. During that call, the employee did not offer Plaintiff any alternative auxiliary aids or services. *See* FAC ¶ 17. Sometime later, Plaintiff unsuccessfully attempted to locate accessible Banana Republic gift cards on his own. *See* FAC ¶ 18. The lack of an accessible gift card deterred Plaintiff from "fully and equally us[ing] or enjoy[ing]" the "facilities, goods, and services Defendant offers to the public at its retail stores." FAC ¶ 42. As soon as accessible gift cards are available, however, "Plaintiff intends to immediately go purchase" one. FAC ¶ 45.

Plaintiff sued Banana Republic under the ADA, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, seeking compensatory damages, punitive damages, and a permanent injunction to "cause a change in Defendant's corporate policies, practices, and procedures so that Defendant's store gift cards will become and remain accessible to blind and visually-impaired consumers," and, of course, attorney's fees.

Banana Republic moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## II. LEGAL STANDARD

### A. Standing

A district court must dismiss a claim under Rule 12(b)(1) if a plaintiff fails to allege facts sufficient to establish standing under Article III of the Constitution. *See Cortlandt Street Recovery Corp. v. Hellas Telecomm.*, 790 F.3d 411, 416–17 (2d Cir. 2015). The plaintiff bears the burden of "alleging facts that affirmatively and plausibly suggest that it has standing to sue." *Id.* at 417 (quotation and

2

alteration omitted). Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, this requires the Court to "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party," but the Court may "rely on evidence outside the complaint." *Hellas Telecomm.*, 790 F.3d at 417 (quotation and alterations omitted).

Constitutional standing has three "irreducible" elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted). Plaintiffs seeking injunctive relief must also prove that the identified injury in fact presents a "real and immediate threat of future injury." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004).

### B. Failure to state a claim

For a complaint to survive a motion to dismiss under Rule 12(b)(6), it "must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). Courts follow a "two-pronged approach" in determining plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (brackets and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*,

556 U.S. at 679). This analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A district court may consider not only the "facts stated on the face of the complaint," but also "documents appended to the complaint or incorporated in the complaint by reference," as well as "matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotations omitted omitted).

To state a claim for violation of Title III, a plaintiff must "establish that (1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA." *Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 368 (2d Cir. 2008).

Plaintiff alleges violations of the ADA, the NYSHRL, and the NYCHRL. The Court turns first to the jurisdictional question of whether it has standing to adjudicate Plaintiff's claims before determining whether the First Amended Complaint survives Defendant's motion to dismiss.

### III. STANDING

#### A. ADA

Under Second Circuit precedent, a plaintiff has standing in an ADA suit seeking injunctive relief—the only relief available to private plaintiffs under Title III—"where (1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was reasonable to infer, based on the past frequency of plaintiff's visits and the proximity of defendants' [services] to plaintiff's home, that plaintiff intended to return to the subject location." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187–88 (2d Cir. 2013) (per curiam). "Applying this standard in *Camarillo* [*v. Carrols Corp.*, 518 F.3d 153 (2d. Cir. 2008)], for example, [the Second Circuit] found standing where (1) defendants had failed to effectively communicate menu items to the legally blind plaintiff—an alleged ADA violation, (2) this discriminatory treatment was likely to continue, and (3) the plaintiff's past visits and proximity to the restaurant made it reasonable

4

to infer her intent to return." *Bernstein v. City of New York*, 621 F. App'x 56, 57 (2d Cir. 2015). The "intent to return" element is critical; "Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111–12 (1983)). "The Supreme Court has repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) (emphasis in original, alterations and internal quotation marks omitted).

Turning first to injury-in-fact: An injury-in-fact under Title III of the ADA exists where plaintiffs "have encountered barriers at public accommodations" and "if they show a plausible intention or desire to return to the place but for the barriers to access." *Small v. General Nutrition Cos., Inc.*, 388 F. Supp. 2d 83, 86 (E.D.N.Y. 2005). This injury can take two forms: "direct injury from personally encountering disability-based discrimination" or "deterrence from using Defendant's property because it is not ADA compliant." *Feltzin v. Triangle Properties #1, LLC*, No. 14-CV-5131(JMA)(ARL), 2016 WL 11599264, at *4 (E.D.N.Y. Dec. 15, 2016) (quotations omitted); *see also Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187–88 (2d Cir. 2013). For the purposes of the standing inquiry here, it is sufficient that Plaintiff alleges to have called Banana Republic's customer service department in an effort to procure a Braille gift card. During that call, Plaintiff learned that the store does not stock Braille gift cards, directly encountering the alleged disability-based discrimination. *See* FAC ¶¶ 16–18.

Similarly, Plaintiff's complaint—though lacking color—sufficiently alleges that Defendant does not plan to start selling Braille gift cards, satisfying the second element of the ADA's standing inquiry. *See* FAC ¶ 15.

The third element is where Plaintiff's all-too-generic complaint fails. "Intent to return is a highly fact-sensitive inquiry that incorporates a range of factors" such as "the frequency of the

5

plaintiff's past visits" and "the proximity of the defendant's services, programs, or activities to the plaintiff's home" along with any other factors "relevant to the calculation" including the plaintiff's "occupation or demonstrated travel habits." *Bernstein*, 621 F. App'x at 59 (citing *Kreisler*, 731 F.3d at 187–88 and *Camarillo*, 518 F.3d at 158); *see also Castillo v. John Gore Org., Inc.*, No. 19-CV-388 (ARR) (PK), 2019 WL 6033088, at *6 (E.D.N.Y. Nov. 14, 2019). Some factors prove more important in some cases than in others. In *Pincus v. Nat'l R.R. Passenger Corp.*, for example, the Second Circuit noted that where a plaintiff is "seeking future access not to one of many local restaurants, but to the only national railway system," she need not "plead the frequency with which she visited Tampa's Amtrak station, the proximity of her home to the station, or reasons for future travel" to establish an intent to return. 581 F. App'x 88, 90 (2d Cir. 2014).

Plaintiff has simply not alleged enough facts to plausibly plead that he intends to "return" to the place where he encountered the professed discrimination. Put differently, there are not enough facts in Plaintiff's complaint to plausibly suggest that he will be injured by Banana Republic's failure to sell Braille gift cards in future. Plaintiff does not profess an interest in procuring contemporary, affordable workwear, nor does he assert that he owns several Banana Republic pieces already and wishes to continue compiling a collection with the help of a Banana Republic gift card. Instead, Plaintiff only vaguely notes that he had "been a customer at Defendant's stores on prior occasions" and that several Banana Republic "stores are located in the Southern District of New York, and in close proximity to Plaintiffs residence." FAC ¶¶ 21, 27. These generic, conclusory statements are plainly insufficient—Dominguez must provide the Court with *some* specific facts demonstrating that it is likely he will be injured by Banana Republic in future. *Cf. Kreisler*, 731 F.3d at 186 (plaintiff sufficiently alleged an intent to return because he asserted that he passed the defendant's diner three to four times a week, frequented other restaurants in his neighborhood, and would attempt to enter the diner were there some indication that it was actually accessible); *Camarillo*, 518 F.3d at 155 (plaintiff sufficiently alleged an intent to return by listing six establishments owned and operated by

6

the defendants that she had recently visited and found inaccessible, and asserted that she often patronized the fast food restaurants near her home); *see also John Gore Org., Inc.*, 2019 WL 6033088, at *6. And it is well established that, in evaluating whether a plaintiff has established standing to sue, a Court "need not credit a complaint's conclusory statements without reference to its factual context." *Amidax Trading Group v. S.W.I.F.T. SCR*, 671 F.3d 140, 146 (2d Cir. 2011) (quotation omitted).

True, the more generic the complaint, the more easily it can be repurposed for use against different defendants. But the greatest asset of copy-and-paste litigation can also be its greatest weakness. And here, that weakness is fully on display; by failing to allege any nonconclusory facts of a real or immediate threat of injury, Plaintiff lacks standing to pursue injunctive relief under the ADA. Or, more pithily: "There is nothing inherently wrong with filing duplicative lawsuits against multiple defendants if the harms to be remedied do exist and are indeed identical. But those who live by the photocopier shall die by the photocopier." *Mendez v. Apple Inc.*, No. 18 CIV. 7550 (LAP), 2019 WL 2611168, at *4 (S.D.N.Y. Mar. 28, 2019).

### B. State and City Laws

Plaintiff's "New York State and City claims are governed by the same standing requirements as the ADA," and, accordingly, fail alongside their federal counterpart. *Mendez v. Apple*, Inc., 2019 WL 2611168, at *4.

Alternatively, after dismissing Plaintiff's ADA claims for lack of standing this Court would decline to exercise supplemental jurisdiction over Plaintiff's remaining claims. A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). And doing so is particularly appropriate where, like here, "all federal-law claims are eliminated before trial." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 727 (2d Cir. 2013) (quotations omitted).

### IV. MERITS OF PLAINTIFF'S CLAIMS

In the alternative—and mindful that a number of courts around the country are grappling

with similar (if not identical) litigation[3]—this Court turns to the merits of Plaintiff's complaint and finds that it would fail under Rule 12(b)(6).

### A. ADA

Determining whether Plaintiff has alleged a violation of the ADA presents a number of issues of first impression, all of which can be reduced to one relatively straightforward question: does Title III of the ADA obligate retailers to provide legally blind consumers with Braille-embossed (or otherwise accessible) gift cards?  Plaintiff's complaint presents a number of theories why it does: (1) gift cards are goods that need to be accessible; (2) gifts cards are, like websites, places of public accommodation and therefore must be independently accessible; and (3) Plaintiff was denied access to Banana Republic's services when Banana Republic denied him a Braille (or otherwise accessible) gift card.  None of these arguments are persuasive.

#### 1. The ADA does not require a business to stock specialty goods

Banana Republic did not violate Title III by failing to stock Braille gift cards, or any other type of accessible gift card.  After all, as Plaintiff seems to concede in its opposition, Title III regulates access to places of public accommodation—not the type of merchandise a place of public accommodation sells.

We start, as is axiomatic, with the text of the statute.  Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).  Discrimination includes:

---

[3] In an attachment to their memorandum of law supporting their motion to dismiss, Defendants submitted PACER records identifying over fifty identical lawsuits Plaintiff has filed against other retailers.  *See* Mot. to Dismiss, Dkt. No. 25, App'x A.  Those defendants include shoe stores (Allbirds, Inc.), bookstores (Taschen America LLC), car companies (Mercedez - Benz USA, LLC, General Motors, LLC), gyms (Technogym USA Corp.), spas (Aire Ancient Baths UES, LLC), and assisted living facilities (The Palm Beach Home For Adults, LLC, Five Star Senior Living Inc., Meridian Senior Living, LLC).  *See id.*

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

*Id.* § 12182(b)(2)(A)(ii). And:

> a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

*Id.* § 12182(b)(2)(A)(iii).

As courts across the country have explained, a plain reading of this text makes clear that Title III prohibits a place of public accommodation from discriminating on the basis of disability when providing *access to* whatever goods and services ordinarily provided at that place of public accommodation. "This language does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000). To make this more concrete, a bookstore could not prohibit a visually impaired person from entering its store, but it need not ensure that the books it sells are available in both Braille and standard print. *See id.* Essentially:

> The prohibition of [Title III] is directed against owners, etc., of places of public accommodation. It prohibits them from discriminating against the disabled. The discrimination prohibited is that the owner, etc., may not deny the disabled *the full and equal enjoyment* of the business's goods and services. Practically speaking, how can an owner, etc., deny the full and equal enjoyment of the goods or services that he offers? By denying access to, or otherwise interfering with, the use of the goods or services that the business offers. The goods and services that the business offers exist *a priori* and independently from any discrimination. Stated differently, the goods and services referred to in the statute are simply those that the business normally offers.

*McNeil v. Time Ins. Co.*, 205 F.3d 179, 186–87 (5th Cir. 2000) (footnotes omitted); *see also Funches v. Barra*, No. 14 CIV. 7382 (KPF), 2016 WL 2939165, at *4 (S.D.N.Y. May 17, 2016).

Gift cards are plainly the type of goods a business normally offers that need not be made accessible pursuant to Title III. It is a "fundamental canon of statutory construction that, unless

otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quotations omitted). As the ADA does not define "goods," we look to the dictionary. The most relevant entry defines goods as "tangible movable personal property having intrinsic value usually excluding money and other choses in action but sometimes including all personal property . . . chattels, wares, merchandise, food products, chemical compounds, and agricultural products." *Good*, Merriam Webster Unabridged, https://unabridged.merriam-webster.com/unabridged/good (last visited Mar. 31, 2020); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 31 (2003) (analyzing the definition of "goods" under the Lanham Act, which, like the ADA, does not define the word, and concluding that the most natural definition of the term is "wares" and "merchandise"). The fact that, according to Plaintiff, the Internal Revenue Service's Internal Revenue Manual requires a retailer to defer the reporting of gift card income until the gift card is used does not change the analysis here. *See* Opp'n at 15 n.42. How and when the retailer ultimately reports the income generated from the sale of a gift card is irrelevant for the purposes of the ADA, and functionally does not change the fact that a retailer sells gift cards to consumers the same way that they sell any other product in its stores.

The Department of Justice's implementing regulations[4] further support the well-established proposition that retailers need not create special, accessible merchandise for legally blind patrons: "[Title III] does not require a public accommodation to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities." 28 C.F.R.

---

[4] The ADA charged the Attorney General with issuing implementing regulations. *See* 42 U.S.C. 12186(b). After a notice-and-comment period, the Department of Justice promulgated regulations implementing Title III. *See generally* 28 C.F.R., Pt. 36; 56 F.R. 35544 (July 26, 1991). Because the text of Title III is unambiguous, Court need not defer to the implementing regulations to conclude that the ADA does not require that a public accommodation alter its inventory for legally blind patrons. *See Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 171 (2d Cir. 2013). Still, these regulations provide useful data and further reinforce the fact that the Court's conclusion accords with the plain meaning of the text.

10

§ 36.307(a). In other words, "[t]he purpose of the ADA's public accommodations requirements is to ensure *accessibility* to the goods offered by a public accommodation, not to *alter the nature* or mix of goods that the public accommodation has typically provided." 28 C.F.R. pt. 36, App'x C (emphasis added). And "[a]ccessible or special goods" are defined by example: "Brailled versions of books, books on audio cassettes, closed-captioned video tapes, special sizes or lines of clothing, and special foods to meet particular dietary needs." 28 C.F.R. § 36.307(c). Just as a bookstore need not create Brailled versions of books that it ordinarily sells to comply with Title III, the Code of Federal Regulations does not require Banana Republic to "design, implement, distribute and sell store gift cards integrated with the Defendant's retail stores that are accessible to blind and vision-impaired individuals[.]" FAC ¶ 55.

There is simply no legal support for Plaintiff's assertion that Title III requires Banana Republic to create Brailled gift cards for the visually impaired. In fact, the plain text of the ADA and the Department of Justice's implementing regulations make clear the exact opposite: a retailer need not alter the mix of goods that it sells to include accessible goods for the disabled.

### 2. Gift cards are not places of public accommodation

If a gift card was a place of public accommodation, it is conceivable that a "failure to take such steps as may be necessary to ensure that no individual with a disability is excluded" from the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of" the gift card itself would violate the ADA. But this provision does not apply for two simple reasons: gift cards are neither public accommodations nor are they places.

Title III prohibits discrimination by "any place of public accommodation." 42 U.S.C. § 12182(a). The ADA does not define a "*place* of public accommodation," but does enumerate twelve categories of places that qualify as "public accommodations" as long as their operations "affect commerce." 42 U.S.C § 12181(7). Each category is featured in a separate subparagraph and is formulated the same way: a disjunctive list of specific examples followed by a general residual

11

clause.  *See id.*  Take, for example, the fifth category:  "a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment."  42 U.S.C. § 12181(7)(E).  Or the seventh:  "a museum, library, gallery, or other place of public display or collection."  42 U.S.C. § 12181(7)(H).  Gift cards are not public accommodations because they fit into none of these categories; they are not places of lodging, establishments serving food and drink, places of exhibition or entertainment, places of public gathering, sales or rental establishments, service establishments, a station used for public transportation, places of public display or collection, places of recreation, places of education, social service center establishments, or places of exercise or recreation.

Even if gift cards could be shoehorned into any one of these twelve categories, plastic cards are not *places*.  Courts in this district have already addressed the question of what constitutes a "place" for the purpose of Title III in the context of deciding that websites are places of public accommodation.  *See Harty v. Nyack Motor Hotel Inc.*, No. 19-CV-1322 (KMK), 2020 WL 1140783, at *4 (S.D.N.Y. Mar. 9, 2020) (citing cases).  In short, those courts have read the word "place" broadly to include every "sales or rental establishment" and "service establishment."  *See Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 393 (E.D.N.Y. 2017).  In other words, the word "place" need not be read as limiting the reach of the ADA to physical spaces.  Congress likely used the words "place of public accommodation" because it could find "no other less cumbersome way to describe businesses that offer" the particular goods or services enumerated in section 12181 "to the public."  *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 572 (D. Vt. 2015).  In fact, coupled with the word "of," the phrase "place of public accommodation" most logically reads as referring to a space—figurative or not—that can provide the services of a public accommodation.  *See id.*

Though broad, this interpretation is not nearly broad enough to encompass gift cards.  Cruise ships are places.  *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 129 (2005).  Gift cards are not.  Gift cards do not sell or rent goods.  They may be *used* to purchase goods from a retailer,

but they are not spaces where those purchases can be made. Put differently, a consumer can make a purchase *with* a gift card, but not *on* or *in* a gift card.

Plaintiff's opposition addresses these points—comprehensively litigated in Defendant's motion—only briefly, and only in the section of Plaintiff's brief asserting that a gift card is a service that Banana Republic offers. *See* Opp'n at 19. In a single sentence, Plaintiff contends that "[l]ike websites, this Court should "deem gift cards a 'place of public accommodation' in and of themselves." In support, Plaintiff quotes at length from a case arising out of the Southern District of Florida: *Gomez v. General Nutrition Corp.*, 323 F. Supp. 3d 1368, 1375, 1379 (S.D. Fla. 2018). But this case does not lend any support for the proposition that a gift card is a place of public accommodation.

In *General Nutrition Corporation* ("GNC"), the Southern District of Florida was determining whether defendant GNC's website was a place of public accommodation within the meaning of the ADA. The relevant portion of the opinion begins with the proposition that, unlike courts within the Second Circuit, "[d]istrict [c]ourts within the Eleventh Circuit agree that the ADA does not apply to a website that is wholly unconnected to a physical location." *GNC*, 323 F. Supp. 3d at 1375. According to these courts, the ADA bars discrimination *outside* of a physical place of public accommodation that deprives an individual of the right to enjoy the goods or services offered to the public *at* the physical place of public accommodation. *See Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1285 (11th Cir. 2002). In other words, "if a retailer chooses to have a website, the website cannot impede a disabled person's full use and enjoyment of the brick-and-mo[r]tar store." *Gomez v. Bang & Olufsen Am., Inc.*, No. 1:16-CV-23801, 2017 WL 1957182, at *4 (S.D. Fla. Feb. 2, 2017). Thus, the *GNC* court needed to determine whether there was a sufficient nexus between GNC's physical stores and GNC's website such that the inaccessible website impeded the plaintiff's full use and enjoyment of the company's stores. In doing so, the court noted several factors that district courts in the Eleventh Circuit consider in determining whether a website has a sufficient nexus to

13

the physical store, and included elements such as, "[w]hether the website provides a service of the public accommodation like the ability to purchase or preorder products" and "whether the website facilitates use of the physical stores." *GNC*, 323 F. Supp. 3d at 1376.

As a threshold matter, courts in the Second Circuit generally agree that Title III's prohibition on discrimination in places of "public accommodation" extends to private commercial websites that affect interstate commerce. *See Harty v. Nyack Motor Hotel Inc.*, No. 19-CV-1322 (KMK), 2020 WL 1140783, at *4 (S.D.N.Y. Mar. 9, 2020) (citing cases). Those courts have relied on a combination of persuasive authority from the First and Seventh Circuits, the ADA's text and legislative history, as well as an instructive Second Circuit case, *Pallozzi v. Allstate Life Insurance Co.*, 198 F.3d 28 (2d Cir. 1999), *opinion amended on denial of reh'g*, 204 F.3d 392 (2d Cir. 2000), applying the ADA to insurance services, to determine that the list of businesses covered by section 12181(7) would include private commercial websites even if those websites existed entirely online and had no nexus to a physical storefront. *See Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 388–98 (E.D.N.Y. Aug. 1, 2017); *Del-Orden v. Bonobos, Inc.*, No. 17 CIV. 2744 (PAE), 2017 WL 6547902, at *7–10 (S.D.N.Y. Dec. 20, 2017); *Scribd Inc.*, 97 F. Supp. 3d at 571 ("The fact that the ADA does not include web-based services as a specific example of a public accommodation is irrelevant because such services did not exist when the ADA was passed and because Congress intended the ADA to adapt to changes in technology . . . . Notably, Congress did not intend to limit the ADA to the specific examples listed and the catchall categories must be construed liberally to effectuate congressional intent.")

This Court agrees with that construction for largely the same reasons articulated in those opinions. As Judge Weinstein persuasively articulated in *Blick Art Materials*, a test that determined whether a website is subject to the ADA by analyzing whether and to what extent the website impedes a "plaintiff's access to a specific, physical, concrete space, and establishes some nexus

between the website and the physical place of public accommodation" is both unworkable and would produce absurd results. *Blick Art Materials*, 268 F. Supp. 3d at 396 (quotation omitted).

> For example, Blick would need to change its website to allow a blind person to find, successfully complete, and use the email list that provides for in-store coupons, but would not need to do so for the email list that only provides online discounts. Blick would have to make accessible information about products available for in-store pickup, but would not have to do so for items available only online, though presumably which item a category falls into could depend on the store selected for pick-up and the inventory it has on hand.

*Id.*; *see also Scribd Inc.*, 97 F. Supp. 3d at 571 (noting that the nexus test would arguably permit a company to "freely refuse to sell its goods or services to a disabled person as long as it did so online rather than within the confines of a physical office or store") Applying such an interpretation of Title III would violate the foundational precept that a statute should be read to avoid "absurd" results. *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 368 (2d Cir. 2006).[5]

True, "[a]s a remedial statute, the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (quotation omitted). That is why courts in the Second Circuit have found that it would be absurd to exclude cyberspace from the ADA's mandate. But reading the words "place of public accommodation" to include small slabs of plastic requires more than just a broad construction of Title III—it requires a rewrite of Title III entirely. "[C]ourts are charged with interpreting the actual text of the laws Congress enacts, and not with rewriting or expanding the scope of the laws in the absence of statutory text, no matter how much one may think it may

---

[5] It is also implausible that an inaccessible gift card could impede a blind person from enjoying all of the benefits of Banana Republic's retail locations. Banana Republic is a retail store that sells clothing and accessories. Customers visit the store to try on clothing and to make purchases. Plaintiff never alleges that Banana Republic gift cards are so intertwined with the store's physical presence that he cannot enter, browse, and try on clothing at Banana Republic stores without an accessible gift card. In fact, his complaint suggests the opposite: The moment Banana Republic starts selling accessible gift cards—and without one in hand— Plaintiff intends to go to a retail store to buy one. *See* FAC ¶ 21. Presumably Dominguez will make that purchase using a credit card, debit card, cash, or even an inaccessible gift card—the same method by which he could purchase any other goods at a Banana Republic store.

advance purported remedial goals or represent congressional intent." *Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 412 (2d Cir. 2019).

### 3. Banana Republic did not deny Plaintiff access to a service by failing to provide him with an accessible gift card

The third of Plaintiff's theories of how liability might attach under the ADA rests on the unsupported premise that Banana Republic's failure to offer Braille or otherwise accessible gift cards excludes him from one of Banana Republic's services: the opportunity to use a Banana Republic gift card to make a purchase at a Banana Republic store. *See* Opp'n at 19.

The law is clear. Section 12182(b)(2) prohibits, among other things, the "failure to take steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). The ADA defines auxiliary aids and services broadly: it includes, among other things, "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments," as well as "modification of equipment or devices" and "other similar services and actions." 42 U.S.C. § 12103(1)(B)–(D).

The Department of Justice's implementing regulations offer additional guidance, further emphasizing that the ADA empowers retailers, not customers, to choose what auxiliary aid to offer:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but *the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication.*

16

28 CFR § 36.303(c)(1)(ii) (emphasis added); *see also* 28 C.F.R. Pt. 36, App'x C ("The auxiliary aid requirement is a flexible one.  A public accommodation can choose among various alternatives as long as the result is effective communication.  For example, a restaurant would not be required to provide menus in Braille for patrons who are blind, if the waiters in the restaurant are made available to read the menu.  Similarly, a clothing boutique would not be required to have Brailled price tags if sales personnel provide price information orally upon request; and a bookstore would not be required to make available a sign language interpreter, because effective communication can be conducted by notepad."); *see also Camarillo*, 518 F.3d at 157 ("While restaurants are not necessarily required to have on hand large print menus that [plaintiff] would be able to read, they are required to ensure that their menu options are effectively communicated to individuals who . . . are legally blind.").

The universe of relevant facts in Dominguez's complaint is as follows:  On a phone call with a Banana Republic customer service employee, he inquired whether the store stocks Braille gift cards.  *See* FAC ¶ 16.  The employee confirmed that the store did not, and did not, of her own accord, offer Plaintiff an auxiliary aid or service.  *See* FAC ¶¶ 16–17.  The Plaintiff then unsuccessfully attempted to locate an accessible Banana Republic gift card.  *See* FAC ¶ 18.  Finding nothing, Plaintiff sued.

Plaintiff was not denied access to an auxiliary aid or service, much less one that effectively communicated information about Banana Republic's gift cards.  The recitation of facts in Dominguez's complaint make it clear that he never even asked for one, even though Plaintiff acknowledges that "no one specific auxiliary aid is mandated" by the ADA.  Opp'n at 22.[6]  He

---

[6] In his opposition, Plaintiff emphasizes that he was never offered an auxiliary aid or service by the Banana Republic employee over the phone.  It is unclear what part of the ADA requires that an employee magically divine, from the single question Plaintiff asked about Braille gift cards, that he was disabled and in need of an auxiliary aid or service.  Indeed, the implementing regulations contemplate that a public accommodation will "*consult* with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed

17

knows nothing about the range of auxiliary aids and services Banana Republic offers the visually impaired. He asked only about Braille gift cards and learned only that Banana Republic does not sell accessible gift cards. *See* FAC ¶¶ 17–18.

To bridge this gap, Plaintiff relies on the rote assertion in his complaint that "[u]pon information and belief, Defendant does not offer auxiliary aids with respect to the gift cards." FAC ¶ 19. This is insufficient. "A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory. Those magic words will only make otherwise unsupported claims plausible when the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018) (internal quotations and citations omitted). No such facts are peculiarly within the possession or control of Banana Republic—Plaintiff could have easily asked Banana Republic's customer service office what gift card related accommodations Banana Republic offers legally-blind patrons, just as he asked whether Banana Republic sells Braille gift cards.

To be clear, there is no doubt that Plaintiff alleges that he was denied a Braille or otherwise accessible gift card. And it is possible that only a fully accessible gift card could provide the effective communication necessary pursuant to Title III.[7] But Plaintiff never tried to discover whether that

---

to ensure effective communication." 28 C.F.R. § 36.303(c)(1)(ii) (emphasis added). A consultation implies a conversation. It would be absurd to read the ADA as requiring that a public accommodation offer every single customer the help of all available auxiliary aids and services before the customer asks for one. *See Castillo v. Hudson Theatre, LLC*, 412 F. Supp. 3d 447, 451 (S.D.N.Y. 2019) (asserting that notice of a patron's alleged disability is an "assumed prerequisite" of a Title III claim for failure to make reasonable accommodations).

[7] Many improbable things are theoretically possible. Although the posture of this case means that the Court need not and should not determine the viability of a Braille gift card as an effective auxiliary aid, it is helpful to keep in mind the following: a gift card is small. It is roughly three inches wide and two inches tall. Still, Dominguez asserts that it should somehow display the following information in Braille somewhere on its surface: the name of the merchant, the denomination of the gift card, the expiration date, the unique card number or PIN, any applicable fees, the terms and conditions of use, a toll-free telephone number, other material information about the card, and somehow, the card's remaining balance. *See* FAC ¶¶ 6, 7, 20, 35, 36, 41, 44, 46, 55. As amicus curiae noted in support of the motion to dismiss in *Murphy v. Kohl's Corporation*, 1:19-cv-09921-GHW (S.D.N.Y.), one of the many identical gift card cases filed in this Court, this ignores a

was the case here.[8]  Thus, as a matter of law, his claim fails.

### B. State and City Laws

The Court need not engage in a substantive analysis of the merits of Plaintiff's NYSHRL and NYCHRL claims.  Because the Court finds that Plaintiff has failed to state a claim under the

---

very elemental problem: "Braille is big. It takes 10 volumes of Braille, for example, to publish Harry Potter and the Goblet of Fire.  Printing Webster's Unabridged Dictionary requires 72 volumes.  Using ADA-mandated size and spacing, the industry-standard gift card could only fit between 11 and 14 Braille characters, horizontally, and 5 lines, vertically.  Thus, a card could hold, at most, 55 to 70 Braille characters." Br. of the Retail Litigation Center, Inc., Restaurant Law Center, National Retail Federation, Retail Gift Card Association, and Nat'l Assoc. of Theater Owners, as *Amici Curiae*, 1:19-cv-09921-GHW, Dkt. No. 30 at 11 (footnotes omitted).

[8] In a strange interlude in Plaintiff's opposition, Dominguez asserts that this Court, notwithstanding Title III's broad view of appropriate auxiliary aids, should find that a "sufficient" auxiliary aid must make the accessible gift card independently accessible.  *See* Opp'n at 19–22.  That is, Plaintiff should not have to rely on a qualified reader as an auxiliary aid, even though the definition of "auxiliary aids and services" distinctly includes "qualified readers," because it would deny Plaintiff the privacy and independence afforded to other customers that choose to use gift cards.  In support, Plaintiff also cites to *American Council of the Blind v. Paulson*, 525 F. 3d 1256 (D.C. Cir. 2008), where the D.C. Circuit required that the Secretary of the Treasury redesign paper currency to make it independently accessible to the legally blind.

To be sure, the Department of Justice's regulations require places of public accommodation to consider "the privacy and independence of the individual with a disability" when providing auxiliary aids and services.  29 C.F.R. § 36.303(c)(ii).  ATMs for example, must "provide the opportunity for the same degree of privacy of input and output available to all individuals," presumably because ATMs require users to input inherently private personal information, like a PIN number, the theft of which could deplete a user of all of their savings.  *See* 36 C.F.R. Pt. 1191, App. D. § 707.  No such specific provision of the ADA or its implementing regulations exempts gift cards from the general rule that a business may offer any auxiliary aid or service that ensures effective communication.  *E.g. West v. Moe's Franchisor, LLC*, No. 15-CV-2846, 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015) ("Nothing in the ADA or its implementing regulations supports Plaintiffs' argument that [the retailer defendant] must alter its [drink] machines in a way that allows blind individuals to retrieve beverages without assistance.")

And the analogy to cash falls apart under even modest scrutiny.  In *Paulson*, the D.C. Circuit declared that cash—with its "constitutional underpinnings" and "special importance"— is intended to function as a "universal medium or common standard" by which individuals "maximize their employment, economic self-sufficiency, independence, and inclusion and integration into society."  525 F. 3d at 1268–69.  It is functionally a non-optional gateway to economic participation.  Because the visually impaired cannot distinguish between individual bills, they lack "meaningful access" to paper currency "that is not remedied by use of existing coping mechanisms."  *Id.* at 1268.  Refusing the visually impaired this access, the court concluded, denies them the ability to engage in economic activity and therefore undermines the thesis of Section 504 of the Rehabilitation Act.  *Id.* at 1269.

As even Plaintiff acknowledges, gift cards are not cash.  Unlike cash, Banana Republic's gift cards are not a "universal medium" by which someone can pay for goods—a retailer's gift cards are an optional method of payment usually accepted only at its own stores, or a few affiliated merchants.  *See* FAC ¶ 29 & n.4.  The constitution makes no mention of gift cards.  And Plaintiff has not asserted that gift cards maximize a person's employment, economic self-sufficiency, independence, or inclusion and integration into society.

19

ADA, this Court would decline to exercise supplemental jurisdiction over Plaintiff's state and city claims. *See infra* Part III(B).

## V. CONCLUSION

Computers have made a lot of things in life easier. Copy-and-paste litigation is one of them. The pitfalls of such an approach is evident here where, among other things, Plaintiff's opposition responds to arguments never made by its opponent in its motion and failed to even correctly identify what Defendant sells. *See, e.g.*, Opp'n at 3, 15, 16, 20 (referring to Banana Republic as a "food establishment"). Although it features the fruit in its name, Banana Republic does not sell bananas.

For the aforementioned reasons, Defendant's motion to dismiss is GRANTED. Within fifteen days, Plaintiff may file a second amended complaint to cure the deficiencies articulated in this opinion by alleging additional facts about the interactions he has had with Banana Republic. If no amended complaint is filed within that time frame, the Court will enter a final judgment of dismissal and direct the Clerk of Court to close this case.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 24.

SO ORDERED.

Dated: April 23, 2020

_____
GREGORY H. WOODS
United States District Judge